Good morning. May it please the Court, Bo Sterling, Las Vegas Pro Bono Counsel for Appellant Ward. We appreciate your taking the case. Thank you, Your Honor. Appellant is a prisoner in the Arizona Department of Corrections. He is serving a 197-year sentence, in essence, life without the possibility of parole. In spite of his sentence, the Department of Corrections is withholding $50 of his prison wages, in what is popularly referred to as gate money, to be given to him upon his release. And he will get it upon his release? I suppose one way or another he will get it, either when he's dead or, as Arizona I expect will argue, if in the remote possibility that somehow he is pardoned or paroled or has his sentence vacated or such. Yes. So it's not really taken from him.  Well, our argument is that it's being taken from him. First of all, if I can back up just a little bit, I don't think it's disputed that he has a property interest in the money. That's what the district court held. That's what the Arizona Supreme Court held. He has some sort of property interest in the money. Yes. Arizona law, if I understand correctly, says prisoners are entitled to be paid for their work. Yes. But also the very same law, or the same body of law, I mean, it's a statutory, this is all statutory, right? Yes. Says $50 of that will be put in an account available for the, that will be given to the prisoner at release. So when you get it, it is conditioned on, that $50 is conditioned on release. Well, I don't understand why that's not part of the property interest. It's being taken, Your Honor, in the sense that he's being deprived of all use of it until, in essence, after he's dead. Well, if you, if you, I mean, you earn money, or we all earn money, and we're free to do with it all sorts of things that prisoners can't do with the money. You can buy video games, or automobiles, or, not that you would, illegal drugs. You know, there are all sorts of things you can do with money when you earn it in the real world that prisoners simply can't do. They can only use it for certain limited things, right? Absolutely right. And the Department of Prison certainly has the right to control very strenuously the conditions on the use of that property for a prisoner. So why isn't this just another condition? As to the $50, the control is you will get it, but you will get it on release. The rest of it you can use. You can't use it to buy a car or, you know, any number of goods that you can get in the real economy. You can only use it at the canteen to buy the things that are available at the canteen. Vastly more restricted use of his money than you have of your money, right? Absolutely. Absolutely. No, and that's not disputed. Our argument is that although the prison certainly can place various restrictions on the use of its money and the use of the money, and it does, that in this particular instance the restrictions are arbitrary because the prison is telling him you can have this gate money to have upon your release so that you'll have some money to get started or for whatever purpose. The prison is telling him that, but there's no real other than speculative possibility that he will ever need the money or be able to use the money for that purpose. But he has no entitlement to the money without that kind of restriction, does he? I mean, he's never had an entitlement to that $50. Well, it is his money. That's not disputed. So in that sense, he's got an entitlement to it, but he's not able to use it, if that's what Your Honor is saying. Absolutely, we agree with that. And so the prison could make him work without paying him at all. Yes. They've given him certain rights. It may be arguable that he has a due process interest because they've given him rights, but they've never given him rights to the first $50. They've always said the first $50 gets held back. If they could make him work and not pay him at all, why can't they hold back the first $50? Well, I don't think it's merely a semantic argument to say that this isn't simply you take the bitter with the sweet, that we give you this money, but we're withholding the $50. The prison still has to act reasonably, or at least not arbitrarily, in determining what those conditions are. And our argument, I admit it's a simple one, it's all we've got, is that under these circumstances, when he is serving, in essence, a life sentence without the possibility of parole, it's arbitrary not to withhold $50 in gate money. Is he engaged in any efforts to set aside his conviction? I'm not sure what the status of he's got various proceedings pending at the moment. I'm sure opposing counsel could go into those. But I will acknowledge, and I just think the court can take judicial notice of the fact, that there certainly is a speculative possibility for any inmate that he may be released at some point, even though he's serving a sentence of life without the possibility of parole. Now, in the factual record we have here, for summary judgment purposes, I think it was more or less accepted by the district court that he's not going to get out. Could I ask a question about why we're here today, what the real issue is? And this isn't the first time that your client has been to see us. There's a long history. And I went back to read our earlier decision in which we remanded to the district court. Yes. And it said in that remand, it says, we reverse the dismissal of Ward's due process claim and remand for further proceedings as to this claim. And so at that stage, at least, we didn't remand takings, we didn't remand equal protection, only the due process claim. What happened that all of a sudden we have all of these claims before us in addition to the due process claim? Well, what we have, Your Honor, is a prisoner. You know, he did his own complaint. And really in the complaint it refers to Eighth Amendment, but it describes the injury as the taking of his $50 and the withholding of that. Now, the district court interpreted that broadly as encompassing the due process and taking claims. So that's why we are here today on these. Let me see if I understand correctly. The district judge decided that when we say go back for the due process claim, we really mean and the takings claim and the equal protection claim and the qualified immunity and the punitive damages? Did he make that ruling? Yes. Or she. Yes. Although, let me, when I say yes, I'm not saying yes as to each of all of those. I think there's a good argument that the equal protection claim was not included as part of the district court ruling. Okay. But certainly the due process and the takings and whatever else might be incorporated within the 14th Amendment due process. I thought the takings claim came in through the 14th Amendment. Yes. That due process encompasses the incorporated Bill of Rights. Yes. And the incorporated portion of the Bill of Rights. And that included the takings. Yes. That's, yes. This all came in under the 14th Amendment due process. That's how I read them in this book. Yes, Your Honor. When it said due process. If you have any other questions right now, I'll reserve the rest of my time. I've got about a minute and a half. Okay. Thank you. Thank you. May it please the Court. My name is Michelle Forney. I'm with the Arizona Attorney General's Office, and I represent Defendant Stewart in this case. Maybe you could clarify this for us, because we don't want to decide more than we were supposed to. Ordinarily, when we send something back with a remand, the district judge looks at our remand and decides what we want the district court to do. And in some of our cases, we've said it's jurisdictional. How did we get all the rest of this? If I'm correct here, the previous case that was before this Court was on Mr. Ward's original complaint. When it was remanded, he filed an amended complaint, which was then put through the screening process, as all inmate cases are. And the Court interpreted it broadly as a due process and takings clause case, but did not mention equal protection at all. Equal protection was raised for the first time in Mr. Sterling's opening brief. So this is a case of due process and takings under the Fourteenth Amendment, and that's based on the amended complaint. I would like to address one of Mr. Sterling's comments, that it was undisputed that Mr. Ward had a property interest. The Department of Corrections admits that Mr. Ward and all inmates have a limited property interest, not an expansive property interest. And this Court recognized that in its questions, I believe, when he said, when you said that he could not possess all of his wages while he's incarcerated. And I'd also like to ---- What do you make of Schneider? Schneider ---- Versus California Department of Corrections. You remember that's the case involving the withholding of interest. So the prisoner there, if I understand the case correctly, had, in order to be able to use the canteen, had to put open up a trust account. And by State law, all the interest from those trust accounts were used for ---- were not given to the prisoner. They were used for other purposes. And we held that that could be a taking. It might be a taking, depending on whether or not the money withheld was used to ---- for upkeep of the account or was used for other purposes. Now, that was a case where the State law that created the right of the prisoners to the money also disposed of the interest. Why is that very much like our case? Well, the Schneider case and the McIntyre case, which were both in this circuit, are distinguishable because they deal with inmate trust accounts with no respect to where the money came from. There's no mention of wages. And in this case, the wages are set forth by the Arizona statutory scheme, which says the director of the Department of Corrections can determine with discretion how much to pay and various limitations on what can be used with the money, what can be done with the money. This was a situation in Schneider where the money had to be put in an inmate trust account so that it could be used by the inmate while he's in prison for the store. And similar to the spendable account with Mr. Ward in the Arizona Department of Corrections. But the interest on the account was used for the benefit of all other inmates in the correctional system. It was used to fund the store and I think for inmates that had no money. So here the gate money is put aside in an account that is Mr. Ward's. No one else is using it. No one ---- it's not benefiting. Well, but as a practical matter, it goes to his heirs. As a practical matter in this case, 99 plus change out of 100, that he will never see this money. It will go to heirs who may be people he doesn't like or doesn't have a particular affinity to. In fact, it could eschew, right? If he has no heirs at law, it could eschew, right? It could go back to the state. So as a practical matter, this money is as useless to him. You say he owns it, but in what sense does he really own it? Well, it is true that it would go to him after he dies through ---- it would go to his heirs. He can't take it with him. That is correct. We all assume. There's nothing stopping him from putting together a will that disposes of him however he would like after his death. It's true that he has no use of it now, but this is the same as if he entered the prison system with a switchblade in his pocket. He couldn't use it while he's in prison, and if he has a life sentence and he's not going to get out, he's not ever going to get that switchblade back. This is disposed of as all of his property would be under Department Order 711. Once he's deceased, it would go to his heirs or it would be disposed of as any other property that would be attributed to him. Why does the state do this if the prisoners will never see the light of day? Well, the statute says all wage-earning prisoners. The Arizona Department of Corrections does not discriminate or determine whether or not a certain inmate is going to be serving a life sentence or not. It's all inmates that are earning wages from the state. They have to set up this. This applies to death row inmates, too. It does if they have jobs. Oh, if they have jobs. I'm not certain that death row inmates are permitted to have jobs, but my understanding is if they do, they would also have this gate money set aside. Okay. There will be no further questions. Thank you. Well, thank you. I'll waive my time then. Unless the Court has any questions, I'll just sum up very briefly. Schneider is relevant in a certain degree of generality, as Justice Kaczynski likes to say. You know, it talks about the takings clause of the shield against the use of arbitrary government power. You know, that's the heart of our argument here, that if he's not It's not really arbitrary. I mean, there is a perfectly good reason for what Arizona does in the general case. Prisoner gets out. If he has zero money in his pocket, he's almost forced to commit a crime to I mean, he might have family or not, but, you know, having pocket money, you know, is pretty much a necessity when he gets out after many years of prison. And if the prisoner doesn't provide the money, then the state probably has to give him some money, you know, walking out money. So there is a legitimate reason for the program as a whole. Yes, I think I agree with that, Your Honor, in the general case. However, when you're dealing with life without the possibility of parole, there should perhaps be at least some sort of a hearing to determine Where do you draw the line? I mean, people have been released after having been convicted of that or even of death sentences because they were found to be innocent by the later discovered DNA evidence. There have been cases of pardons. I mean, you know, it doesn't happen that often, but it does happen. Yes. And I would draw the line at this case. Okay. Thank you. Thank you, Your Honor. I don't mean to be flippant, but I think the Court understands my argument. Thank you very much. We do understand. Thank you once again for taking the case. The case is argued and will stand submitted.
judges: Kozinski, Wallace, Clifton